**UNITED STATES of America, Plaintiff,**

v.

**Alfredo HUERTA–OROZCO, a/k/a Jose Huerta–Orozco Defendant.**

**No. CR99–4069MWB.**

United States District Court, N.D. Iowa, Western Division.

Feb. 8, 2001.

17. *See* Letter by Rogers Group dated February 2, 2001

Shawn S. Wehde, Special Assist., U.S. Atty., for U.S.

Brien O'Brien, Sioux City, IA, for Alfredo Huerto-Orozco.

## MEMORANDUM OPINION AND ORDER REGARDING DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL OR, IN THE ALTERNATIVE, FOR A NEW TRIAL

BENNETT, Chief Judge.

## TABLE OF CONTENTS

I. BACKGROUND ....................................................765

II. LEGAL ANALYSIS ..............................................766
 A. Huerta–Orozco's Motion for Judgment of Acquittal .......................766
 1. Standards applicable to motions for judgment of acquittal ............766
 2. Sufficiency of the evidence ........................................768
 B. Huerta–Orozco's Motion for New Trial ...............................772
 1. Standards applicable to motions for new trial .......................772
 2. Weight of the evidence ............................................773

III. CONCLUSION ..................................................776

## I. BACKGROUND

On November 16, 1999, a United States Grand Jury for the Northern District of Iowa returned a one-count indictment charging that, Alfredo Huerta–Orozco ("Huerta–Orozco") and Jose Ochoa–Heredia ("Ochoa–Heredia") did knowingly and intentionally possess with intent to distribute, and aid and abet the possession with intent to distribute, 500 grams or more of

a liquid mixture or substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, in violation of 21 U.S.C. § § 841(a)(1) and 841(b)(1)(A). The methamphetamine which forms the basis of this charge was discovered as a result of a traffic stop of a taxicab, in which Huerta–Orozco and Ochoa–Heredia were passengers, in October of 1999.

On October 31, 2000, the case against Huerta–Orozco proceeded to trial before a jury.[1] At trial, the government called four law enforcement officers, a criminalist and the taxicab driver. The government introduced various exhibits, including, *inter alia,* laboratory reports of the controlled substances obtained during the investigation of this case, a videotape of the traffic stop of the taxicab, photographs of three bags, one of which contained the methamphetamine, photographs of the actual bottles that contained the liquid mixture of methamphetamine, a cellular phone that was seized from Huerta–Orozco, two cellular phone chargers and an extra battery. At the close of the government's case, Huerta–Orozco moved for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. The court reserved ruling on this motion. In his defense, Huerta–Orozco called one witness, namely, his co-defendant, Ochoa–Heredia.[2] At the conclusion of all of the evidence, Huerta–Orozco renewed his motion for judgment of acquittal, and, once again, the court reserved ruling on the motion. On November 2, 2000, the jury returned a verdict of guilty as to the charge of possession of methamphetamine with intent to distribute it under both theories advanced by the government, to wit: personally committing the offense, and (2) aiding and abetting another in the commission of the offense.

On November 8, 2000, Huerta–Orozco filed a timely post-trial motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, as well as a motion for new trial pursuant to Federal Rule of Criminal Procedure 33. The government has resisted Huerta–Orozco's post-trial motions. The court deems the matter fully submitted, and, therefore, turns initially to the standard of review governing motions for judgments of acquittal under Federal Rule of Criminal Procedure 29, and then to a legal analysis of the issues raised by Huerta–Orozco in his motion for judgment of acquittal. Thereafter, but only if necessary, the court will address Huerta–Orozco's motion for new trial.

## II. LEGAL ANALYSIS

### A. Huerta–Orozco's Motion for Judgment of Acquittal

#### 1. Standards applicable to motions for judgment of acquittal

■ The court has considered in detail the standards applicable to motions for judgment of acquittal, *see United States v. Ortiz,* 40 F.Supp.2d 1073 1078–79 (N.D.Iowa 1999) and *United States v. Saborit,* 967 F.Supp. 1136, 1138–40 (N.D.Iowa 1997), and will set forth the highlights of those discussions, as well as some more recent case law, here. Rule 29 of the Federal Rules of Criminal Procedure provides, in pertinent part, as follows:

> The court on motion of a defendant or of its own motion shall order the entry of judgment of acquittal of one or more offenses charged in the indictment or information after the evidence on either

---

**1.** On September 14, 2000, co-defendant Ochoa–Heredia appeared before United States Magistrate Judge Paul A. Zoss and entered a plea of guilty to count one of the indictment. On that same date, Judge Zoss filed a Report and Recommendation in which he recommended that Ochoa–Heredia's guilty plea be accepted (# 68). On October 2, 2000, this court accepted Judge Zoss's Report and Recommendation of September 14, 2000, and accepted Ochoa–Heredia's plea of guilty in this case to count one of the indictment (# 69).

**2.** Huerta–Orozco did not testify at trial.

side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses.

FED.R.CRIM.P. 29(a). Although Rule 29 specifically provides for such eventualities, it is well-settled that "[j]ury verdicts are not lightly overturned." *United States v. Hood,* 51 F.3d 128, 129 (8th Cir.1995); *accord United States v. Burks,* 934 F.2d 148, 151 (8th Cir.1991). Rather, the case law governing motions for judgment of acquittal confirms that a significant restraint is placed on a district court's authority to overturn a jury's verdict. *See United States v. Gomez,* 165 F.3d 650, 654 (8th Cir.1999) (observing that a judgment of acquittal should only be granted "if there is no interpretation of the evidence that would allow a reasonable jury to find the defendant guilty beyond a reasonable doubt"); *United States v. Perkins,* 94 F.3d 429, 436 (8th Cir.1996) (" '[t]he standard of review of an appeal concerning the sufficiency of the evidence is very strict, and the verdict of the jury should not be overturned lightly.' ") (quoting *Burks,* 934 F.2d at 151), *cert. denied,* 519 U.S. 1136, 117 S.Ct. 1004, 136 L.Ed.2d 882 (1997).

The United States Court of Appeals for the Eighth Circuit has therefore instructed that "[t]he jury's verdict must be upheld if there is an interpretation of the evidence that would allow a reasonable jury to find the defendant guilty beyond a reasonable doubt." *United States v. Moore,* 108 F.3d 878, 881 (8th Cir.1997); *Perkins,* 94 F.3d at 436 (" 'The jury's verdict must be upheld if there is an interpretation of the evidence that would allow a reasonable-minded jury to conclude guilt beyond a reasonable doubt.' ") (quoting *United States v. Erdman,* 953 F.2d 387, 389 (8th Cir.), *cert. denied,* 505 U.S. 1211, 112 S.Ct. 3009, 120 L.Ed.2d 883 (1992)). Here, Huerta–Orozco contends that his motion for judgment of acquittal should be granted because the government's evidence at trial would not permit a reasonable jury to find him guilty beyond a reasonable doubt.

■ In considering a motion for judgment of acquittal based on the sufficiency of the evidence, the court must "view the evidence in the light most favorable to the guilty verdict, giving the government the benefit of all reasonable inferences that may be drawn from the evidence."[3] *United States v. Basile,* 109 F.3d 1304, 1310 (8th Cir.), *cert. denied,* 522 U.S. 866, 118 S.Ct. 173, 139 L.Ed.2d 115 (1997); *accord United States v. Madrid,* 224 F.3d 757, 761–62 (8th Cir.2000) (stating that "in reviewing the District Court's denial of the motion for acquittal, we view the evidence in the light most favorable to the verdict and will reverse only if no reasonable jury could have found beyond a reasonable doubt that the defendant is guilty of the

3. In *Ortiz,* this court noted that it had discussed in one of its earlier cases, *see Saborit,* 967 F.Supp. at 1140–43, the existence of two apparently inharmonious lines of Eighth Circuit Authority regarding the standard to be applied when considering a challenge to the sufficiency of the evidence to sustain a conviction. *Ortiz,* 40 F.Supp.2d at 1079 n. 1 (citing *Saborit* and referring to *United States v. Baker,* 98 F.3d 330, 338 (8th Cir.1996), *cert. denied,* 520 U.S. 1179, 117 S.Ct. 1456, 137 L.Ed.2d 561 (1997)) (observing that if the evidence reasonably supports two conflicting hypotheses—guilt and innocence—the reviewing court must not disturb the jury's finding) and *United States v. Davis,* 103 F.3d 660, 667 (8th Cir.1996), *cert. denied,* 520 U.S. 1258, 117 S.Ct. 2424, 138 L.Ed.2d 187 (1997) (holding that " '[w]here the government's evidence is equally strong to infer innocence of the crime

charged as it is to infer guilt, the verdict must be one of not guilty ...' " quoting *United States v. Kelton,* 446 F.2d 669, 671 (8th Cir. 1971)). Once again, the court observes as it did in *Ortiz* and *Saborit,* that during the last ten years, the Eighth Circuit Court of Appeals has overwhelmingly applied the *Baker* standard—that is, if the evidence reasonably supports two contrary theories, the reviewing court must not disturb the jury's determination. *id.* (citing *Baker,* 98 F.3d at 338); *see also United States v. Turner,* 157 F.3d 552, 556 n. 5 (8th Cir.1998) (noting apparent discrepancy and following *Baker* ). The parties have not raised the issue here and the court concludes that, regardless of the standard applied in this case, the result as to the defendant's motion for judgment of acquittal would be the same.

offense charged") (citation omitted); *United States v. Vig*, 167 F.3d 443, 447 (8th Cir.1999) (observing that "[w]e review the district court's denial of a motion for judgment of acquittal based on the sufficiency of the evidence by viewing the evidence in the light most favorable to the verdict."). The court can overturn a jury's verdict only if " 'a reasonable fact-finder must have entertained a reasonable doubt about the government's proof' " of one of the essential elements of the crime charged. *United States v. Kinshaw*, 71 F.3d 268, 271 (8th Cir.1995) (quoting *United States v. Nunn*, 940 F.2d 1128, 1131 (8th Cir.1991)). Furthermore, "[t]his standard applies even when the conviction rests entirely on circumstantial evidence." *United States v. Davis*, 103 F.3d 660, 667 (8th Cir.1996), *cert. denied*, 520 U.S. 1258, 117 S.Ct. 2424, 138 L.Ed.2d 187 (1997).

In addition to allowing a conviction to be based on circumstantial and/or direct evidence, the Eighth Circuit Court of Appeals has instructed that "[t]he evidence need not exclude every reasonable hypothesis except guilt." *United States v. Baker*, 98 F.3d 330, 338 (8th Cir.1996), *cert. denied*, 520 U.S. 1179, 117 S.Ct. 1456, 137 L.Ed.2d 561 (1997). The court can neither weigh the evidence nor assess the credibility of the witnesses; these tasks belong exclusively to the jury. *United States v. Ireland*, 62 F.3d 227, 230 (8th Cir.1995) (noting it is the jury's job to judge the credibility of witnesses and to resolve contradictions in evidence). Having examined the appropriate standard of review, the court turns now to its consideration of the defendant's motion.

### 2. Sufficiency of the evidence

The court will begin by considering the sufficiency of the evidence to support Huerta–Orozco's conviction on the possession with intent to distribute charge set forth in the single count indictment. The government submitted two alternative theories upon which the jury could find Huerta–Orozco guilty of possession of methamphetamine with intent to distribute it, to wit: (1) personally committing the offense, and (2) aiding and abetting another in the commission of the offense. The jury convicted Huerta–Orozco of this offense under both theories.

In order to convict Huerta–Orozco of this charge, the government was required to prove beyond a reasonable doubt at least one of these alternative theories against Huerta–Orozco. Under its first alternative theory—that is, that Huerta–Orozco personally committed the offense charged in the indictment by knowingly and intentionally possessing 500 grams or more of a liquid mixture or substance containing a detectable amount of methamphetamine with intent to distribute it—the government had to prove, beyond a reasonable doubt, that (1) Huerta–Orozco was in possession of methamphetamine; (2) Huerta–Orozco knew that he was, or intended to be, in possession of a controlled substance; and (3) Huerta–Orozco intended to distribute some or all of the controlled substance to another person. Thus, the government had to prove that Huerta–Orozco knowingly possessed the methamphetamine with the intent to distribute. *See United States v. McCracken*, 110 F.3d 535, 541 (8th Cir. 1997) (stating that to convict a defendant on a violation of 21 U.S.C. § 841(a)(1), "the government had to prove that he knowingly possessed the methamphetamine with the intent to distribute") (citations omitted); *United States v. Thomas*, 58 F.3d 1318, 1322 (8th Cir.1995) (articulating essential elements government must prove to establish a violation of 21 U.S.C. § 841(a)(1)). Possession may be either actual or constructive. *Saborit*, 967 F.Supp. at 1143 (citations omitted). "While mere physical proximity to contraband is insufficient to convict a person of possession with intent to distribute, "knowledge of presence", plus control over the thing is constructive possession." *United States v. Lemon*, 239 F.3d 968, 969–70 (8th Cir.2001) (citing *United*

*States v. Johnson*, 18 F.3d 641, 647 (8th Cir.1994)). "If there is knowledge, control is established by proof the person has 'dominion over the premises in which the contraband is concealed.'" *Id.* (citations omitted); *see also United States v. Surratt*, 172 F.3d 559, 564 (8th Cir.) ("'Constructive possession of [contraband] is established if a person has "ownership, dominion or control over the contraband itself, or dominion over the premises in which the contraband is concealed."'") (quoting *McCracken*, 110 F.3d at 541, in turn quoting *United States v. Ojeda*, 23 F.3d 1473, 1475 (8th Cir.1994)), *cert. denied*, 528 U.S. 910, 120 S.Ct. 257, 145 L.Ed.2d 216 (1999); *United States v. Nelson*, 165 F.3d 1180, 1183 (8th Cir.1999) (quoting *McCracken*, 110 F.3d at 541, in turn quoting *Ojeda*, 23 F.3d at 1475); *United States v. Gillings*, 156 F.3d 857, 860 (8th Cir.1998) (citing *McCracken*, 110 F.3d 535, 541 (8th Cir.1997)) ("Proof of constructive possession is sufficient to satisfy the element of knowing possession. Constructive possession of drugs can be established if a person has 'ownership, dominion or control over the contraband itself, or dominion over the premises in which the contraband is concealed.'").

Under its second alternative theory—that is, that Huerta–Orozco aided and abetted another in the possession of methamphetamine with intent to distribute it—the government had to prove, beyond a reasonable doubt that, (1) Huerta–Orozco knew that the crime of possession of methamphetamine with intent to distribute it was being committed or was going to be committed; (2) Huerta–Orozco knowingly acted in some way for the purpose of causing, encouraging, or aiding the possession of methamphetamine with intent to distribute it; (3) Huerta–Orozco knew that the substance to be distributed was a controlled substance; and (4) Huerta–Orozco intended that some or all of the methamphetamine would be distributed to another person.

Huerta–Orozco contends that the evidence was insufficient to find him guilty under either theory because the government was unable to prove that he was ever in possession or control of the methamphetamine, and that the record is devoid of any evidence concerning his knowledge of the methamphetamine or his intent to distribute the methamphetamine. Huerta–Orozco's theory of defense was that he was merely a passenger in the taxicab driven and that his mere presence as a passenger in a car from which the police recovered the methamphetamine does not establish his possession of the methamphetamine or that he was aiding and abetting possession of the methamphetamine with intent to distribute it. Viewing the totality of the evidence in the light most favorable to the government, however, the court concludes that the evidence is sufficient for the jury to have found that Huerta–Orozco was guilty beyond a reasonable doubt under both theories.

The government presented testimony of the law enforcement officer responsible for stopping the taxicab and discovering the methamphetamine, Trooper John Mathis. He testified that on October 31, 1999, while stopping a semi-tractor trailer ("semi") on Interstate 29 near Sioux City, Iowa, for bypassing a weigh station, he was passed by a taxicab. He noticed that the taxicab had Nebraska license plates and a large Omaha radio station advertisement displayed in its rear window, and that it appeared to be speeding. Trooper Mathis testified that through his training, he was aware that taxicabs were being used to transport drugs from Omaha to Sioux City. After Trooper Mathis dealt with the semi, he caught up with the taxicab, performed a pace on the cab, and determined that the taxicab was traveling at 72 miles per hour in a posted 65 miles per hour zone. He stopped the taxicab near the Sergeant Bluffs exit for speeding. The occupants of the taxicab were the driver, Scott Street, and two passengers in the back seat of the vehicle, namely, Huerta–Orozco and Ochoa–Heredia. It was la-

ter discovered that Ochoa–Heredia and Huerta–Orozco were traveling with three duffle bags that were located in the trunk of the taxicab.

At the scene of the stop, Trooper Mathis initially asked Huerta–Orozco and Ochoa–Heredia for identification. Trooper Mathis testified that Huerta–Orozco provided him with false identification, which was admitted in evidence at the trial. Trooper Mathis also testified that Ochoa–Heredia was the first one to get out of the cab when he searched the three duffle bags in the trunk, and that Ochoa–Heredia originally indicated that the bag that contained the drugs belonged to Huerta–Orozco. When Huerta–Orozco emerged from the back seat of the taxicab, and denied ownership of the bag, both Huerta–Orozco and Ochoa–Heredia, thereafter, denied any ownership or knowledge of the bag with the drugs. A search of the three duffle bags revealed that one of those bags contained six prepackaged bottles wrapped in duct tape and plastic wrap to mask the liquid mixture containing the methamphetamine. The government introduced photographs of these bottles, and had criminalist Staci Schmeiser testify that the liquid in the bottles was well over 500 grams, and that the liquid did, in fact, contain methamphetamine.

█ The government also presented the testimony of Agent Northway who was called to the scene of the traffic stop. He testified that upon observing a cellular phone on Huerta–Orozco's person, he seized it, and by hitting the redial button on Huerta–Orozco's cellular phone, Agent Northway determined that the last number called was (712) 899–2155. It was established that this number, hand-written on a business card, was found on Huerta–Orozco's person in his wallet. The location of the business card with the (712) 899–2155 phone number is significant in light of the following cross-examination testimony of Ochoa–Heredia:

Q. Okay. While you were on the bus en route to Sioux City, you were instructed to call Topo at a phone number where he could be reached in Sioux City.

A. Topo?

Q. Yes, Topo.

A. We had agreed that I would give him a call from some motel.

Q. In Sioux City?

A. Yes.

Q. And you had the number?

A. No, I don't have it with me right now.

Q. Okay. But at the time that you were traveling a year ago, you knew the number that you were to call?

A. No.

Q. So if you didn't know the number, how would you be able to call him?

A. Yes, I used to have it, but I don't remember it anymore right now.

Q. So when you were traveling from California to Sioux City, you did know the number that you were to call?

A. I gave Topo the phone number. Oh, I gave Topo the number of the phone that my friend had.

Q. So when you were en route from California to Sioux City, you did not have a cell phone?

A. No, I didn't. My friend had it, and I borrowed it from him.

Q. And the friend you're talking about is Defendant Huerta had the cell phone?

A. Yes, he had the cell phone.

Q. And when you were in Salt Lake City, you used that cell phone to call Topo; correct?

A. Yes, I gave Topo the number.

Q. You called Topo with Huerta's cell phone and gave him the number to Huerta's cell phone?

A. Yes, I talked to him.

Q. And Topo was to call you on that cell phone—Topo was to call that cell phone to make contact with you guys?

A. I told him to call me or I would call him.

Q. And in Salt Lake City you kept the cell phone; correct?

A. Yes, I kept it.

Q. For the rest of the bus ride from Salt Lake City to Omaha, you had the cell phone?

A. Yes, I was bringing it.

Q. And you didn't use the cell phone on any other occasion other than when you called Topo in Salt Lake?

A. No, I didn't make any more calls.

Q. And the phone didn't ring for you between Salt Lake and Omaha?

A. No.

Q. And in Omaha you no longer had that cell phone in Omaha; correct?

A. No, I gave it back to its owner.

Q. And when you were in Omaha, you took the—when you were in Omaha, when you got off the bus, you got in a taxi cab with your friend Huerta?

A. Yes.

Q. And you were with him in the taxi cab from Omaha to Sioux City?

A. Yes.

Q. And the phone didn't ring while you were in the car with him; correct?

A. No, I didn't hear it.

Q. And neither you nor your friend Huerta used the cell phone to call out?

A. No.

Q. And the officers took the cell phone from your friend out at the traffic stop?

A. I don't recall it, but it seems to be.

Q. So the plan was to somehow communicate by cell phone with Topo when you got to Sioux City or near Sioux City; correct?

A. Yes.

Transcript Testimony of Ochoa–Heredia (# 93) at 13–16. It was further established through Ochoa–Heredia's testimony that Topo was the person in Sioux City with whom Ochoa–Heredia had an agreement to transport the drugs from California to Iowa. Based on the preceding colloquy, therefore, the court finds that it was reasonable for the jury to conclude, albeit tenuously, that Huerta–Orozco knew that Ochoa–Heredia was using his cell phone to contact Topo. This is so because Ochoa–Heredia testified that while he was with Huerta–Orozco, he was in possession of the cellular phone from California to Nebraska and that the only call he made with that phone was to Topo. Ochoa–Heredia further testified that when he returned the phone to Huerta–Orozco, the cell phone was not used by either himself or Huerta–Orozco to make an outgoing call up until the time of the traffic stop. Therefore, the fact that Huerta–Orozco had a business card in his wallet with a number written on it that was the same number of the last number dialed on his cellular phone, coupled with Ochoa–Heredia's testimony that he had only called Topo with Huerta–Orozco's phone, and that during the trip, Huerta–Orozco never made an outgoing call, a reasonable jury could have concluded that Huerta–Orozco did know that drugs were being transported and that the use of his cellular phone was facilitating the transportation of the methamphetamine.

Furthermore the government established that Huerta–Orozco and Ochoa–Heredia knew each other for a period of time and had lived in the same area of California, namely, Waterford, California. That, on or about October 31, 1999, Huerta–Orozco and Ochoa–Heredia traveled together from Waterford, California, first by car, then by bus, and ultimately by taxicab, to Sioux City, Iowa. The government presented evidence regarding the cost of the bus tickets that both Huerta–Orozco and Ochoa–Heredia purchased in order to travel from California to Omaha, Nebraska, $130.00 each, as well as the cost of the taxicab fare from Omaha, Nebraska, to Sioux City, Iowa, $175.00. Scott Street, the taxicab driver who picked up both Huerta–Orozco and Ochoa–Heredia at the Greyhound bus station in Omaha and drove them to Sioux City, testified that he requested $175.00 up front for the cab ride

from Huerta–Orozco and Ochoa–Heredia, but was amenable to receiving only $90.00 of the $175.00 up front, and receiving the balance of the fare when Huerta–Orozco and Ochoa–Heredia reached their destination in Sioux City. Lastly, the jury heard the testimony of Task Force Officer Kerry Northway in which he stated that many times the transport of controlled substances for purposes of distribution comes from the west coast and involves certain sophistication of packaging (to mask the sight/smell of drugs from others including drug dogs), transportation (by various means), and communication (by cellular phones and pagers), all to mask detection.

In reviewing the sufficiency of the evidence on defendant's motion for judgment of acquittal, this court must "view the evidence in the light most favorable to the government, and resolving evidentiary conflicts in favor of the government, and accepting all reasonable inferences drawn from the evidence that support the jury's verdict." *Surratt*, 172 F.3d at 562 (citations and internal quotations omitted). Viewing the evidence in such a light, and giving the government the benefit of all reasonable inferences, the court concludes that there is sufficient evidence in the trial record to support the jury's conviction of Huerta–Orozco on the possession of methamphetamine with intent to distribute it under both theories advanced by the government. Although Ochoa–Heredia testified that the drugs belonged to him and that Huerta–Orozco did not possess, much less know, that drugs were in the bag, and that he pled guilty to the offense for which Huerta–Orozco was on trial, the government did endeavor to call into question the credibility of Ochoa–Heredia. The government did this by presenting the testimony of Task Force Agent Sandy Gutierrez who highlighted particular portions of Ochoa–Heredia's initial statements that he subsequently changed. Thus, based on Task Force Officer Sandy Gutierrez's testimony, a jury could draw reasonable inferences that Ochoa–Heredia changed his statements and attempted to assume full re-

sponsibility for the offense charged in an effort to aid Huerta–Orozco. It was the jury's function to evaluate Ochoa–Heredia's credibility and to weigh his testimony against the government's evidence of constructive possession and aiding and abetting. This the jury did, and, therefore, the court will not overturn the jury's verdict of guilt on the charge of possessing with intent to distribute methamphetamine and acquit Huerta–Orozco. *See Surratt*, 172 F.3d at 565 ("It is not necessary for the evidence before the jury to rule out every reasonable hypothesis of innocence. It is enough that the entire body of evidence be sufficient to convince the fact-finder beyond a reasonable doubt of the defendant's guilt.") (citing *United States v. Noibi*, 780 F.2d 1419, 1422 (8th Cir.1986)). Accordingly, the court denies Huerta–Orozco's motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29.

In addition to filing a motion for judgment of acquittal, Huerta–Orozco also filed a motion for new trial pursuant to Federal Rule of Criminal Procedure 33. Because these motions have differing standards, the court will proceed to consider Huerta–Orozco's motion for new trial pursuant to Federal Rule of Criminal Procedure 33.

### B. Huerta–Orozco's Motion for New Trial

Huerta–Orozco has also moved for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure. Because the standards under which this motion is evaluated differ substantially from those applied to a motion for judgment of acquittal, the court will begin by setting forth the governing standards, and will then turn to its consideration of the defendant's motion for new trial.

### 1. Standards applicable to motions for new trial

In *Saborit*, this court also had occasion to consider in some detail the standards applicable to motions for new trial. *Saborit*, 967 F.Supp. at 1144–45. Rather than

repeat that discussion in its entirety here, the court will again set forth the highlights of these standards.

 Federal Rule of Criminal Procedure 33 provides in relevant part as follows: "The court on motion of a defendant may grant a new trial to that defendant if required in the interest of justice." FED. R.CRIM.P. 33. District courts have broad discretion in passing upon motions for new trial and such rulings are subject to reversal only for a clear abuse of discretion. *See United States v. Wilkins,* 139 F.3d 603, 604 (8th Cir.1998); *United States v. Brown,* 108 F.3d 863, 866 (8th Cir.1997); *United States v. Blumeyer,* 62 F.3d 1013, 1015 (8th Cir.1995), *cert. denied,* 516 U.S. 1172, 116 S.Ct. 1263, 134 L.Ed.2d 212 (1996).

 A court evaluates a Rule 33 motion from a different vantage point than it evaluates a Rule 29 motion for judgment of acquittal. *Ortiz,* 40 F.Supp.2d at 1082. Indeed, "[a] district court's power to order a new trial is greater than its power to grant a motion for acquittal." *United States v. Ruiz,* 105 F.3d 1492, 1501 (1st Cir.1997); *accord United States v. Bennett,* 956 F.2d 1476, 1481 (8th Cir.1992) ("This narrowly constricted power of review [applicable to motions for judgment of acquittal] is in contrast to the district court's broad discretion in ruling upon a motion for new trial."); *United States v. A. Lanoy Alston, D.M.D., P.C.,* 974 F.2d 1206, 1211 (9th Cir.1992) ("A district court's power to grant a motion for a new trial is much broader than its power to grant a motion for judgment of acquittal."). In assessing whether a defendant is entitled to a new trial on the ground that the verdict is contrary to the weight of the evidence, "the district court weighs the evidence and evaluates anew the credibility of the witnesses to determine if a miscarriage of justice may have occurred." *Davis,* 103 F.3d at 668; *accord United States v. Misle Bus & Equip. Co.,* 967 F.2d 1227, 1232 (8th Cir.1992); *United States v. Brown,* 956 F.2d 782, 786 (8th Cir.1992).

As the United States Court of Appeals for the Eighth Circuit has explained:

"When a motion for a new trial is made on the ground that the verdict is contrary to the weight of the evidence, the issues are far different from those raised by a motion for judgment of acquittal. The question is whether he is entitled to a new trial. In assessing the defendant's right to a new trial, the court must weigh the evidence and in doing so evaluate for itself the credibility of the witnesses." *United States v. Lincoln,* 630 F.2d [1313,] 1316 [ (8th Cir.1980) ]. The court will only set aside the verdict if the evidence weighs heavily enough against the verdict that a miscarriage of justice may have occurred.

*United States v. Rodriguez,* 812 F.2d 414, 417 (8th Cir.1987). The authority to grant new trials, however, "should be used sparingly and with caution." *United States v. Lincoln,* 630 F.2d 1313, 1319 (8th Cir. 1980).

### 2. *Weight of the evidence*

In his motion for new trial, Huerta–Orozco challenges the weight of the evidence supporting his conviction, asserting that the evidence weighs heavily enough against the verdict to indicate that a miscarriage of justice has occurred. As the court indicated earlier, to convict Huerta–Orozco of possession of methamphetamine with intent to distribute it under the first alternative, the government had to prove that he knowingly possessed the methamphetamine with the intent to distribute. *See McCracken,* 110 F.3d at 541 (stating that to convict a defendant on a violation of 21 U.S.C. § 841(a)(1), "the government had to prove that he knowingly possessed the methamphetamine with the intent to distribute") (citations omitted); *Thomas,* 58 F.3d at 1322 (articulating essential elements government must prove to establish a violation of 21 U.S.C. § 841(a)(1)). Because the government presented no evidence that Huerta–Orozco actually possessed the methamphetamine found in the

bag that was located in the trunk of the taxicab, the government had to prove that Huerta–Orozco constructively possessed the methamphetamine. *See United States v. Buford,* 108 F.3d 151, 153 (8th Cir.1997) ("Possession may be either actual or constructive."); *accord United States v. Anderson,* 78 F.3d 420, 422 (8th Cir.1996).

Here, the evidence showed that both Huerta–Orozco and Ochoa–Heredia were passengers in the taxicab. However, no direct evidence was produced that Huerta–Orozco had dominion and control over the drugs found in the duffle bag, which was located in the trunk of the taxicab. In fact, there were three bags that were located in the trunk of the taxicab, only one of which contained the drugs. The only evidence that linked Huerta–Orozco to the bag that contained the drugs was the testimony of Trooper Mathis who testified that at the scene of the traffic stop, Ochoa–Heredia originally denied ownership of the bag that contained the methamphetamine, and instead indicated that the bag belonged to Huerta–Orozco. However, Trooper Mathis testified that after Huerta–Orozco emerged from the back seat of the taxicab, and denied ownership of the bag, both Huerta–Orozco and Ochoa–Heredia denied ownership of the bag, and neither implicated the other. The government contends that Ochoa–Heredia's initial statements to Trooper Mathis when he pointed the finger at Huerta–Orozco were truthful, and that his subsequent recantation of that statement

to his present statement that Huerta–Orozco had no knowledge of the methamphetamine is false. To buttress this contention, the government attempted to call into question the credibility of Ochoa–Heredia's testimony by way of Task Force Officer Agent Sandy Gutierrez. She testified that the statements Ochoa–Heredia originally made upon his arrest were different than his present statements concerning Huerta–Orozco's involvement in the offense. The court emphasizes, however, that the statements Ochoa–Heredia originally made to Task Force Officer Agent Sandy Gutierrez were before he pled guilty. Thus, the court is not surprised that Ochoa–Heredia originally made inculpatory statements concerning Huerta–Orozco for selfish reasons, namely, to distance himself from any involvement in the offense. Ultimately, however, Ochoa–Heredia did plead guilty to the offense, and from that moment onward, he accepted full responsibility for the offense. The court finds that Ochoa–Heredia had little or no incentive to minimize Huerta–Orozco's role in the offense,[4] and because the government failed to show otherwise, the court concludes that Ochoa–Heredia's guilty plea sheds favorable light on the credibility of his testimony.

The court also points out that the government did not present any evidence linking Huerta–Orozco to the methamphetamine, other than it being found in the taxicab in which he was a passenger, and his association with Ochoa–Heredia. For

**4.** In fact, the court notes that Ochoa–Heredia's testimony in this trial occurred before he was sentenced. The court finds this significant because the sentencing guidelines provide for a two level enhancement in a defendant's offense level "[i]f the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense." U.S. Sentencing Guidelines Manual § 3C1.1 (1995). In *United States v. O'Dell,* 204 F.3d 829 (8th Cir.2000), the Eighth Circuit Court of Appeals noted that "section 3C1.1 was amended to make it clear that it applies to those situations in which the obstruction oc-

curs in a case closely related to the defendant's case, such as that of a codefendant." *Id.* at 836 n. 4 (citing U.S. Sentencing Guidelines Manual § 3C1.1 amend. 581 (App. C Supp.1998) (amendments effective Nov. 1, 1998)); *see also United States v. Walker,* 119 F.3d 403, 406–07 (6th Cir.) (defendant given an obstruction of justice enhancement where he gave perjured testimony during the trial of his codefendant), *cert. denied,* 522 U.S. 1036, 118 S.Ct. 643, 139 L.Ed.2d 621 (1997). Thus, Ochoa–Heredia most likely knew, from the advice of his counsel, that he could potentially be hit with a two level enhancement for perjured testimony at Huerta–Orozco's trial.

example, there was no fingerprint evidence on the bottles that contained the liquid mixture containing the methamphetamine, other physical or scientific evidence, or eyewitness testimony that connected him with the methamphetamine. The simple fact that law enforcement officers seized a cellular phone from Huerta–Orozco's person, and two cellular chargers and a battery from his duffle bag add very little to the evidence against him. The cellular phone, chargers and battery were offered to show that means of communication were available to both Huerta–Orozco and Ochoa–Heredia when they traveled from California to Iowa. The inference suggested by this evidence is that the cellular phone was used to contact their drug sources or persons to whom they were transporting the drugs. Ochoa–Heredia did testify that he called Topo with Huerta–Orozco's cellular phone, however, he testified that Huerta–Orozco did not know who he was calling and what the purpose was for his call. The government produced no evidence showing otherwise— that is, that Huerta–Orozco knew who Ochoa–Heredia called.

Moreover, the mere fact that the (712) 899–2155 phone number, which was determined to be the last number called with Huerta–Orozco's cellular phone, and law enforcement's discovery of a business card with that same phone number in Huerta–Orozco's wallet, adds very little against Huerta–Orozco. The government relies heavily on this fact, however, the government did not produce the phone records of Huerta–Orozco's cellular phone. The court questions the lack of this particular evidence given the fact that Huerta–Orozco's conviction was based exclusively on thin circumstantial evidence. The court notes that if Huerta–Orozco actually knew Topo, it is more than likely that he would have contacted him at an earlier date, or called the (712) 899–2155 phone number before meeting up with Ochoa–Heredia. Even if the phone records would not have shed light on Huerta–Orozco's alleged involvement in the transportation of the methamphetamine, it would have shed light on whether or not outgoing calls, other than those made by Ochoa–Heredia, were made with Huerta–Orozco's cellular phone during the trip to Iowa. At trial, Ochoa–Heredia testified that the cellular phone was in his possession from California to Nebraska, but that from Nebraska to Iowa, it was in Huerta–Orozco's possession. He also testified that, while they were in the taxicab, neither he nor Huerta–Orozco made an outgoing call. Upon a review of the evidence, however, the court points out that there was a window of opportunity when Huerta–Orozco could have placed a call to the (712) 899–2155 number, specifically, when Ochoa–Heredia and Huerta–Orozco were in the bus depot in Nebraska trying to get a taxicab to Iowa. Most importantly, however, the government failed to establish the identity of the person subscribed to (712) 899–2155. Thus, while it is plausible that this number belonged to Topo, it is equally plausible that it belonged to somebody else not involved in the drug trade. The court is deeply troubled that the government, with all its vast resources, was unable to establish to whom that number belonged. This is especially troubling in light of Ochoa–Heredia's testimony that Huerta–Orozco did not know that he was transporting methamphetamine, and that he did not know Topo.

Although the court concluded earlier regarding Huerta–Orozco's motion for judgment of acquittal that there was sufficient evidence adduced by the government to support Huerta–Orozco's conviction, that result was reached only when construing the evidence in the light most favorable to the guilty verdict, giving the government all reasonable inferences that may be drawn from the evidence. Applying the less restrictive standard for review applicable to motions for new trial, however, the court concludes that the evidence weighs heavily enough against the verdict that a miscarriage of justice may have occurred in this case. Therefore, the court

will set aside the verdict in this case and grant Huerta–Orozco's motion for new trial.

### III. CONCLUSION

The court concludes that based upon its review of the evidence, and viewing the evidence in the light most favorable to the government, a reasonable jury could have found Huerta–Orozco did knowingly and unlawfully possess with the intent to distribute and aid and abet the distribution of 500 grams or more of a liquid mixture containing a detectable amount of methamphetamine, in violation of 21 U.S.C. § § 841(a)(1) and 841(b)(1)(A), respectively. Consequently, the court **denies** Huerta–Orozco's motion for judgment of acquittal. However, applying the less restrictive standard of review for motions for new trial, the court concludes that the evidence weighs heavily enough against the verdict that a miscarriage of justice may have occurred in this case. Consequently, the court will set aside the verdict in this case and **grant** Huerta–Orozco's motion for new trial.

**IT IS SO ORDERED.**